UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **CoxCom, Inc. dba Cox Communications New England**<br><br>Plaintiff,<br><br>vs.<br><br>**Lori Dale**<br><br>Defendant | **Case No.: 04-CV-391**<br><br>**AFFIDAVIT OF MARK MATTEO** |

Now comes the affiant, and makes this his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. My name is Mark Matteo.
2. I am employed by Cox as a Security Supervisor.
3. I am familiar with the business records of Cox associated with the Defendant, Lori Dale
4. I have been trained and I am familiar with coaxial cable non-addressable descrambling and with technology designed to covertly descramble cable television's scrambling/security system.
5. I have been trained and I am familiar with the testing of converters/descramblers to determine if such devices have been modified to receive unauthorized interception of signals.
6. Cox issues/leases devices to its subscribers called "**addressable converters/descramblers**". These devices convert signals for older televisions that

are not "cable ready" and they descramble signals based upon the instructions that the cable company sends to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler is that it is "addressable". That means the cable company can "address" the descrambler. "Addressability" refers to the descramblers ability to descramble signals based only upon the instructions that it receives from the cable company.

7. In the fall of 2001 the defendant was in possession of and had issued to her account a particular Pioneer brand converter/descrambler, bearing serial number DK4C3B; the box had been issued to the Defendant on February 19, 1998.
8. In March of 2001 Cox received an anonymous phone call where the caller indicated that the defendant was receiving Cox's signals without authorization.
9. Based upon this information it was determined that I should do some addressability tests on box number DK4C3B to determine if it was addressable, that is to determine if the box still took instructions.
10. On October 11, 2001 I initiated the sending of electronic instructions to box number DK4C3B. These instructions, if received, as they should have been by the box, would have created an anomaly in the box. In fact, they should have instructed the box to cease all operations such that the box would no longer operate at all.
11. As part of the investigation into this matter, a Cox employee called the Defendant's phone number on October 22, 2001 and inquired as to whether the cable box was receiving channels with no problem. A female individual confirmed that she was at the address and the television was working "fine".
12. The television operations through box DK4C3B should not have been working "fine" at this point in time. If it had been taking instructions it would have ceased operations.

If the box had been modified to refuse to take instructions that would explain why the instructions to shut down the box had not reached the box.

13. On October 30, 2001 two Cox employees went to the home of the Defendant. They were met at the home by an individual who identified himself as Mr. Dale. Cox inquired as to whether he was having any problems with the cable service. He stated "no'. Cox then informed him that the cable box in question was apparently refusing to take instructions and that Cox must take the box to examine it.
14. He refused to allow the Cox employees into his house. He voluntarily gave box DK4C3B to the two Cox employees in exchange for box GRMGFM.
15. Shortly after Converter/descrambler box DK4C3B (hereinafter the "device") was returned to Cox, I tested the device. The box was found to be receiving and descrambling all analog cable channels including the premium channels and pay-per-view channels. The box and the defendants' account were not authorized to receive these channels.
16. My examination of box DK4C3B revealed that there was evidence of it having been reprogrammed by device not authorized by Cox such as a so called "field test generator" (FTG/CUBE). A field test generator could modify the box to covertly allow the box to receive channels it was not legitimately authorized to receive.
17. My examination of box DK4C3B also revealed evidence that Cox's communications with the box to reset the box to take instructions had been inhibited by either the use of an in-line device such as a data/FM trap or on in-line field test generator.
18. Essentially my examination of box DK4C3B revealed evidence that the box had most likely been modified by a field test generator to open up the box to descramble all

analog stations and that the periodic instructions sent to the box and the specific testing instructions I sent to this particular box were being blocked either by a filtering device or by a field test generator that also acted as a filtering device to keep out the new instructions.

19. My findings with reference to the box were consistent with the fact that even after I instructed the box to essentially shut down it kept operating. It would keep operating if my instructions were blocked out of the box by some type of filtering device.

20. At the pertinent time the Defendant was paying $39.33 per month for her cable television service. Bear in mind that an individual in possession of a descrambling device, in this case a modified converter/Descrambler, would still need to purchase some cable television signals from the Plaintiff in order to allow signals to enter the home and thereafter be descrambled.

21. All the time that the Defendant was in possession of the subject box, from February 1998 to October, 2001, the Defendant's account history revealed that she had ordered one pay-per-view event in 1998.

22. It is absolutely clear that the box had been modified at least from the time of the anonymous tip in March of 2001 until the box came out in October of 2001. It can be inferred, based upon the Defendants' account history and without any other evidence from the defaulted Defendant, that the box had been modified to obtain on authorize signals soon after it went into the account. Accordingly, we can infer that the box was obtaining unauthorized interception of signals from March 2001 until October 2001, a period of 8 months;

23. During the above referenced 8 month period the Defendants were paying on average $42.12 per month for her service from the Plaintiff.

24. During the above referenced 8 month period the charge for all of the premium channels that would have been available to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time, varied significantly but on average that monthly amount would be $32.85.

25. The differential between the value of the premium channels the Defendants were receiving through the use of the black box and the amount he was paying for was $32.85; accordingly, the net value of premium channel services received through the use of the black box would be $32.85 per month.

26. During the above referenced 8 month period the charge for and the number of pay per view offerings that were accessible to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time varied significantly but, on average, there were numerous movies offered per month at a cost of $3.95 per movie,

27. During the above referenced 8 month period the charge for and the number of adult pay per view offerings that were accessible to the Defendants through the use of the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time varied significantly but, on average, there were numerous offerings available per month at an average cost of $8.95 per offering.

28. During the above referenced 8 month period the charge for and the number of special event pay per view offerings that were accessible to the Defendants through the use of

the black box, averaging into the calculation the fact that signals were being transferred to digital feed over that period of time varied significantly but, on average there was at least one special event (e.g.; boxing or wrestling match) per month at a cost of between $9.95 and $54.95 per special event.

Subscribed and sworn to, under the pains and penalties of perjury, this 18th day of August, 2005.

Mark Matteo